STEPHANIE S. CHRISTENSEN
Acting United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
KHALDOUN SHOBAKI (Cal. Bar No. 232864)
Assistant United States Attorney
Deputy Chief, Cyber & I.P. Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0759
    Facsimile: (213) 894-2927
    E-mail:   khaldoun.shobaki@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>RAMON OLORUNWA ABBAS,<br>  aka "Ray Hushpuppi,"<br>  aka "Hush,"<br><br>    Defendant. | No. 2:20-CR-322-ODW<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT RAMON OLORUNWA ABBAS<br><br>Hearing Date: September 21, 2022<br>Hearing Time: 1:30 p.m.<br>Location: Courtroom of the Hon.<br>          Otis D. Wright II |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Khaldoun Shobaki, hereby files its sentencing position for defendant Ramon Olorunwa Abbas.

///

///

///

This sentencing position is based upon the attached memorandum of points and authorities, the government's concurrently filed sealed submissions to the Court, the presentence investigation report ("PSR"), the United States Pretrial and Probation Office's ("USPO") recommendation letter, the victim impact statements, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 7, 2022            Respectfully submitted,

                                        STEPHANIE S. CHRISTENSEN
                                      Acting United States Attorney

                                      CHRISTOPHER D. GRIGG
                                      Assistant United States Attorney
                                      Chief, National Security Division

                                      */s/ Khaldoun Shobaki*
                                      KHALDOUN SHOBAKI
                                      Assistant United States Attorney

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Until his arrest by the Dubai Police Department in June 2020, defendant Ramon Olorunwa Abbas was a prolific international fraudster and money launderer who flaunted his wealth and lifestyle on social media. Defendant's social media accounts, often under the moniker "Ray Hushpuppi," showcased his crime-funded lifestyle, and frequently showed him wearing designer clothes and expensive watches and posing with luxury cars.[1] The FBI's investigation in this case confirmed that - as long suspected by the press in his native Nigeria – defendant was engaged in a wide range of crime, and that the flashy lifestyle he advertised on social media was financed through crime.

After his arrest in Dubai, defendant was brought by the FBI to the United States to face charges. Defendant is in custody awaiting sentencing after pleading guilty to conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h). For the reasons set forth below and in the accompanying sealed filings, the government recommends that defendant be sentenced to 135 months' imprisonment, followed by a three-year term of supervised release, and that defendant be ordered to pay restitution of $1,732,841.34, a fine of $500,0000, and a mandatory special assessment of $100.

**II.   FACTUAL BACKGROUND & RELEVANT CONDUCT**

On April 20, 2021, defendant pleaded guilty pursuant to a written plea agreement to conspiracy to engage in money laundering.

---

[1] As of the date of this filing, defendant's Instagram account @hushpuppi has 2.8 million followers, approximately 500,000 more followers than at the time of his arrest in Dubai. His last post, a photograph of a white Rolls Royce Cullinan from June 6, 2020, has over 100,000 comments, many lionizing him, with some posted today.

(Abbas Dkt. 11.)  On July 27, 2021, the government filed a redacted version of defendant's plea agreement.  (Abbas Dkt. 46.)

The factual basis admitted by defendant in the plea agreement discusses criminal conduct in this case, Case No. 2:20-CR-322-ODW (the "Abbas Case") and conduct in Case No. 2:21-CR-203-ODW (the "Juma Case").  Defendant's admitted money laundering also touched two more cases charged in the Central District of California: Case No. 2:20-CR-576-ODW (the "Alaumary Case") and Case No. 2:20-CR-614-MCS (the "DPRK Case").[2]  The facts of the DPRK Case and the Alaumary Case highlight the long-reaching harm that money laundering causes, and specifically how defendant conspired to facilitate the laundering of funds for the North Korean regime.[3]  Defendant's role in each of these cases as either a fraud scheme leader and/or a money launderer should inform the Court's sentencing decision under 18 U.S.C. § 3553(a).

**A.   The Abbas Case (2:20-CR-322-ODW))**

In this case, defendant pleaded guilty to conspiracy to engage in money laundering between January 2019 and June 2020.  (PSR ¶ 13.) Defendant's admitted factual basis covers both the criminal conduct charged in this case (the Abbas Case), and defendant's participation in the crimes charged in the Juma Case.  The individual identified as "UICC 1" in the information and factual basis in the Abbas Case was Ghaleb Alaumary, a convicted money launderer and coconspirator of defendant.  Defendant, in concert with Alaumary, conspired to launder

---

[2] For readability, citations to documents on the dockets of these four cases have been shortened to "Abbas Dkt.," "Juma Dkt.," "Alaumary Dkt.," and "DPRK Dkt.," respectively.

[3] North Korea is also referred to as the Democratic People's Republic of Korea ("DPRK").

2

funds derived from various crimes, including bank cyber-heists, business email compromise ("BEC") schemes, and other online frauds. BEC or email account compromise schemes typically involve gaining unauthorized access to a business email account and attempting to trick a victim business into making an unauthorized wire transfer. According to FBI statistics, between June 2016 and December 2021, victims lost over $43 billion because of BEC schemes. See https://www.ic3.gov/Media/Y2022/PSA220504. Defendant admitted to money laundering conspiracy in connection with the following:

The Maltese Bank Heist. Beginning in January 2019, defendant conspired with Alaumary and others to launder funds stolen from a bank in Malta. Defendant provided Alaumary with bank account information for an account in Romania. (PSR ¶ 15; Abbas Dkt. 11 at 6.)[4] Defendant told Alaumary that the bank account was "for large amounts[.]" (PSR ¶ 16; Abbas Dkt. 11 at 6.) About a month later, in response to a request for more accounts to receive funds from a "big hit in 12th feb," defendant provided bank account information for an account in Bulgaria. (PSR ¶ 18; Abbas Dkt. 11 at 6-7.) On February 12, 2019, Alaumary told defendant that €500,000 had been wired to the Romanian account, and defendant responded with a screenshot of the contents of that account. (PSR ¶¶ 21-22; Abbas Dkt. 11 at 7.) North Korean hackers were charged with conducting the Maltese bank heist in the DPRK Case. Defendant admitted that the actual or intended loss

---

[4] Abbas Dkt. 11 is the information filed against defendant. As part of his plea agreement, defendant admitted to the conspiracy charged therein, and specifically "admit[ted] the truth of the allegations in Overt Acts 1 to 17." (Abbas Dkt. 46 (Redacted Plea Agreement).)

with respect to the Maltese bank was approximately $14,700,000 (€13,000,000).  (PSR ¶ 44; Abbas Dkt. 46 at 17.)

The United Kingdom BECs.  In May 2019, Alaumary told defendant that he needed a bank account for a scheme to "swap" the account on file[5] that could "handle millions and not block."  (PSR ¶ 24; Abbas Dkt. 11 at 8.)  Defendant provided Alaumary with details for a Mexican bank account in response to this request.  (Id.)  Alaumary then informed defendant that the Mexican account would be used to receive £100 million from a professional soccer club located in the United Kingdom, and £200 million from a company also located in the United Kingdom.  (PSR ¶ 25; Abbas Dkt. 11 at 8.)  Defendant told Alaumary that he could not "simply keep collecting" bank accounts from other coconspirators, and that bank accounts "cost a lot of money now to open."  (Id.)  Defendant agreed to provide more accounts if the transfers from the two United Kingdom victims were successful.  (PSR ¶ 26; Abbas Dkt. 11 at 8.)  Defendant admitted that the actual or intended loss with respect to the United Kingdom victims was approximately $7,740,000 (£6,000,000).  (PSR ¶ 44; Abbas Dkt. 46 at 17.)[6]

The New York Law Firm BEC.  In October 2019, defendant or a coconspirator fraudulently induced a victim law firm in New York to transfer approximately $922,857.76 from its bank account to an account in the name of someone other than defendant or Alaumary.

---

[5] In the context of a BEC, swapping the account means tricking a victim into swapping a fraudster-controlled bank account number for a legitimate account to misdirect and steal payments.

[6] Defendant and Alaumary anticipated £6,000,000 per week in fraudulent payments in connection with these schemes.  (PSR ¶ 33.)  The admitted loss amount corresponds to the first anticipated payment of fraud proceeds.

4

(PSR ¶¶ 27-31; Abbas Dkt. 11 at 8-9.)  Thereafter defendant and Alaumary communicated about and shared information about a successful wire transfer of approximately $396,050 of those funds to an account controlled by a coconspirator.  (Id.)  Defendant admitted that the actual or intended loss with respect to the New York law firm victim was approximately $922,857.76.  (PSR ¶ 44; Abbas Dkt. 46 at 17.)

### B.   The Juma Case

Between the date of defendant's arrest in Dubai and his decision to plead guilty approximately ten months later in the Abbas Case, the government continued to investigate defendant's related criminal conduct.  That investigation showed that defendant's fraud and money laundering activities extended well beyond his criminal collaboration with Ghaleb Alaumary.

On February 12, 2021, the United States filed a sealed criminal complaint against Abbas and five co-defendants in the Juma Case. Defendant agreed to plead guilty in the Abbas Case approximately two months later, while the Juma Case was still sealed.  As discussed below, the charges in the Juma Case relate to a scheme to defraud an individual in Qatar who was seeking a loan of $15 million for a project to build an international school.

As part of defendant's plea agreement in the Abbas Case, the United States agreed to dismiss the complaint against defendant in the Juma Case.  (Abbas Dkt. 46 at 4-5.)  Defendant explicitly agreed that the conduct he admitted in the plea agreement with respect to the Juma Case was relevant conduct, as defined in U.S.S.G. § 1B1.3. (Id. at 14.)  Because it is relevant conduct, defendant's fraud and money laundering in the Juma Case should be considered by the Court at sentencing.

Beginning in December 2019, defendant conspired with Kenyan national Abdulrahman Imraan Juma and others to defraud a Qatari company (the "Qatari Victim Company,") and its owner (the "Victim Businessperson"). (PSR ¶¶ 35-36; Abbas Dkt. 46 at 14.) Juma was already in contact with the Victim Businessperson when defendant joined the scheme. Defendant began to communicate with the victim posing as a Wells Fargo Bank employee named "Malik." (Id.) As part of the scheme, the conspirators opened a bank account at Wells Fargo Bank in Canoga Park, California using the name of the Qatari Victim Company. (PSR ¶ 37; Abbas Dkt. 46 at 15.)

Between December 19 and 24, 2019, defendant and Juma duped the Victim Businessperson into paying approximately $330,000 to fund an "investor's account" to facilitate the $15 million loan. (PSR ¶ 38; Abbas Dkt. 46 at 15.) Defendant specifically directed the Victim Businessperson to send $100,000 to a bank account controlled by a coconspirator, and $230,000 to the bank account of a luxury watch seller. (Id.) Defendant used those funds for his personal benefit, including purchasing a $230,000 Richard Mille RM11-03 watch, which defendant arranged to have brought to him from New York to Dubai. (PSR ¶ 39; Abbas Dkt. 46 at 16.) The watch was delivered to defendant on approximately January 4, 2020. (Id.) Soon thereafter, the Richard Mille watch began to appear on defendant's Instagram feed, where he would specifically call it out with the hashtag #RichardMille, including, for example in the following posts on January 13, March 17, and May 31, 2020:

  

Defendant also instructed a coconspirator to exchange some of the remaining $100,000 to Nigerian Naira for delivery to accounts controlled by defendant. (PSR ¶ 40; Abbas Dkt. 46 at 16.) Defendant arranged for a total of $50,000 to be paid to individuals identified by a coconspirator to obtain a St. Christopher (St. Kitts) and Nevis citizenship and passport for defendant. (Id.) Defendant received the St. Kitts passport in February 2020. (Id.)

In January and February 2020, defendant and Juma corresponded with the Victim Businessperson, attempting to fraudulently induce a further payment of $575,000 in purported taxes to release the $15 million loan. (PSR ¶ 41; Abbas Dkt. 46 at 17.) In February 2020, the Victim Businessperson sent approximately $299,983.58 to Kenyan bank accounts specified by Juma. (Id.) In March 2020, defendant fraudulently induced the Victim Businessperson to send another $180,000 to U.S. bank accounts; those funds were subsequently laundered with assistance from several coconspirators. (PSR ¶ 42;

Abbas Dkt. 46 at 17.)  Defendant admitted that the actual or intended loss with respect to the Victim Businessperson and Qatari Victim Company was approximately $809,983.58.  (PSR ¶ 44; Abbas Dkt. 46 at 17.)  The Victim Businessperson's victim impact statement was filed under seal for the Court's review.

### C. The Alaumary Case (2:20-CR-576-ODW)

Ghaleb Alaumary ("UICC 1" in the Abbas Case) was arrested on October 17, 2019, pursuant to an arrest warrant issued in the Southern District of Georgia.  On November 3, 2020, Alaumary agreed to plead guilty to an information in the Central District of California in Case No. 2:20-CR-576-ODW, charging him with conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h).

As part of his guilty plea, Alaumary admitted his role in 2019 as a conspirator in the laundering of funds from the heist from the Maltese bank.  (Alaumary Dkt. 1 at 10-11.)[7]  Defendant also admitted that he conspired with Alaumary to launder proceeds of that heist. (Abbas Dkt. 11 at 6-7.)  The U.S. government has charged North Korean hackers with this bank cyber-heist.  Defendant and Alaumary thus schemed to launder funds destined for the North Korean regime.

Pursuant to Federal Rule of Criminal Procedure 20, the Alaumary Case was transferred to the Southern District of Georgia for a guilty plea and sentencing.  On September 14, 2021, Alaumary, who violated the same statute as defendant, was sentenced to 140 months' imprisonment and ordered to pay over $30 million in restitution.

---

[7] Alaumary admitted that he conspired with another individual (somewhat confusingly also identified as "UICC 1" in the Alaumary Case) to launder the funds stolen from the Maltese bank.  UICC 1 in the Alaumary Case was later identified in the DPRK Case as indicted North Korean hacker Kim Il (or another coconspirator North Korean hacker).  (DPRK Dkt. 8 at 18.)

8

**D. The DPRK Case (2:20-CR-614-MCS)**

The final case relevant to defendant's sentencing is the December 8, 2020, indictment of three North Korean hackers for a years-long hacking and theft campaign. In the DPRK case, the defendants are alleged to have been members of the North Korean military intelligence agency known as the Reconnaissance General Bureau ("RGB"). Specifically, the defendants and their coconspirators are alleged to have been members of two units of the RGB known as Lazarus Group and Advanced Persistent Threat 38 ("APT38").

The conspiracy charged in the DPRK Case includes allegations that Lazarus Group and APT38 engaged in, among other things, cyber-enabled bank heists. Those heists were done "for the benefit of the DPRK regime," and during the pendency of the charged conspiracy, "the hackers attempted to steal or extort more than $1.3 billion." (DPRK Dkt. 8 at 2-3.) The defendants in the DPRK Case are charged with, among other things, the heist from the Maltese bank. (Id. at 18 O.A. 11-12.) That is the same heist for which defendant and Alaumary conspired to provide money laundering services.[8]

**III. SENTENCING GUIDELINES CALCULATION**

As set forth in its sealed submissions, the government's position is that defendant's total offense level for the purposes of sentencing should be 31. The government agrees with the USPO's assessment that defendant's criminal history category is I. (PSR

---

[8] Alaumary sent defendant information about the identity of the Maltese bank victim. The government is not aware of evidence that defendant knew that he was conspiring to launder funds for North Korea. The government is also not aware of evidence that defendant ever attempted to ascertain for whom the funds were being laundered.

9

¶ 79.) This yields an advisory guidelines range of 108 to 135 months.

In its disclosed recommendation letter, the USPO recommends that defendant be ordered to pay $1,732,841.34 in restitution, and that the Court impose three years of supervised release. (Recommendation Letter at 1-2.) The government agrees with these recommendations, but also believes that defendant should be fined $500,000.

**IV. THE GOVERNMENT'S SENTENCING POSITION**

All the factors to be considered by the Court under 18 U.S.C. § 3553(a) in imposing a sentence on defendant weight in favor a substantial sentence. For the reasons explained below, the government submits that a sentence of 135 months' imprisonment is sufficient but not greater than necessary to comply with the purposes of the law.

    **A. Nature of the Offense**

The admitted scope of defendant's money laundering and fraud touched victims in New York, the United Kingdom, Malta, and Qatar. He had coconspirators in Nigeria, Kenya, Canada, and in the United States, among other places. Defendant used bank accounts throughout the world, and in the Central District of California. Defendant was a prominent and well-connected fraudster and money launderer who used his social media presence to facilitate and enhance his criminal activity. Defendant engaged in a brazen and far-reaching conspiracy. He was an equal opportunity criminal, his intended and actual victims ranging from a small law firm to a businessperson seeking to build a school, to a bank, to a professional soccer club. Whoever the victim, with no regard for nature of the underlying crime or the identity of the criminals who he was helping, defendant was ready to

10

pose as a banker, lie to victims, or provide bank accounts to stash the proceeds of crime. Defendant's conduct was reprehensible and deserves serious punishment.

**B. Seriousness of the Offense and Just Punishment**

Money laundering is the lifeblood of the global criminal financial ecosystem.[9] In 2011, well before the explosion in online fraud, the United Nations Office on Drugs and Crime estimated that criminals "may have laundered $1.6 trillion, or 2.7 per cent of global GDP" in 2009.[10] Money launderers like defendant make it possible and profitable for others to engage in crime and to enjoy the fruits of their bad acts. By his own admission, during just an 18-month period defendant conspired to launder over $300 million.[11] While much of this intended loss did not ultimately materialize, defendant's willingness and ability to participate in large-scale money laundering highlights the seriousness of his criminal conduct. With respect to just the two schemes involving the New York law firm and the Qatari school, defendant successfully laundered over $1.7 million in fraud proceeds. What is more, defendant did not just launder funds to facilitate other crimes; he engaged affirmatively in fraud himself, and then laundered the proceeds of that crime, namely,

---

[9] Money laundering is a scourge recognized by the international community as "inextricably linked to the underlying criminal activity that generated it. Laundering enables criminal activity to continue." https://www.fatf-gafi.org/faq/moneylaundering/#d.en.11223.

[10] See UNDOC, Illicit Money: how much is out there? at https://www.unodc.org/unodc/en/frontpage/2011/October/illicit-money_-how-much-is-out-there.html

[11] For purposes of sentencing, in his plea agreement defendant admitted actual or intended loss to victims of between $9.5 million and $25 million. (Abbas Dkt. 46 at 17-18.) This loss figure counts only the first £6,000,000 per week in fraudulent payments in connection with the U.K. victims. (See supra n.6.)

11

the fraud scheme charged in the Juma Case. Defendant's crimes were serious and had significant deleterious impact on the victims, as reflected in the victim impact statement.

Defendant's crimes are also particularly egregious because they involved the rogue nation state North Korea. Defendant conspired with Alaumary to launder funds for the DPRK. Even if he did not know that the DPRK was his ultimate customer, defendant's willingness to launder funds for all comers highlights the serious risks to global security posed by money launderers like defendant. With respect to the DPRK, the United Nations Panel of Experts has recognized that the regime "continue[s] to maintain and develop its nuclear and ballistic missile programmes in violation of Security Council resolutions," and generates illicit revenue in violation of U.N. sanctions through cybercrime. See United Nations Security Council, Final Report of the Panel of Experts, S/2022/132, at 4, 80 (2022). Defendant's crimes are serious and just punishment calls for a long term of custody.

**C.  Deterrence & Respect for the Law**

Courts have widely recognized that general deterrence is paramount in white collar crimes like those committed by defendant. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)).[12] The Martin court

---

[12] The Seventh Circuit has described this need for strong general deterrence in white collar cases as a "widely accepted principle." United States v. Brown, 880 F.3d 399, 405 (7th Cir. 2018) (collecting cases).

12

further observed that "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." Id.; see also United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (approving of the sentencing court's view that "insider trading requires high sentences" to deter those who consider it "a game worth playing.") Like insider trading, money laundering is often difficult to detect and prosecute, making general deterrence even more necessary than in other areas of the law.

And general deterrence is particularly important in this case. Like many money launderers (including coconspirator Alaumary), defendant operated from outside the United States, facilitating crimes both inside the United States and around the globe. Despite their attempts to avoid prosecution by operating abroad, both defendant and Alaumary were eventually captured by U.S. law enforcement. The Court's sentence here is an opportunity to send a message to others who consider this "a game worth playing" and one that is unlikely to result in meaningful consequences. A significant prison sentence will send the message to other would-be money launderers that the risk of spending substantial time in prison in the United States outweighs the potential financial benefits of their crimes.

The objectives of general deterrence will also be particularly well-served here because of defendant's notoriety on social media and in the press. Before his arrest, defendant cultivated a significant online following, marketing an ostentatious lifestyle made possible by the proceeds of his crimes. Since defendant's arrest in 2020, he has been the subject of significant press coverage both in Nigeria

13

and in the international media. It is likely that news of the outcome of defendant's sentencing will also be widely disseminated, including to other money launders and fraudsters who believe that they are beyond the reach of the law. By imposing the significant sentence recommended by the government, the Court will send a strong deterrent message.

The objective of specific deterrence is similarly served by a custodial sentence. Defendant has no criminal history in the United States but has engaged in a lengthy career of fraud and money laundering, including but not limited to the crimes charged in the Abbas Case. Defendant's conduct demonstrates contempt for the rule of law, and callous disregard for the many victims of his crimes. Like many who find themselves in custody in the United States and facing sentencing, defendant has now expressed remorse. Nonetheless, to deter this long-time fraudster and money launderer from continuing his life of crime, a significant custodial sentence is necessary.[13]

### D. Defendant's History and Characteristics

Defendant reports being born and raised in Nigeria by parents who provided him with an education, including after-school tutoring. (PSR ¶¶ 84-88.) Defendant has two younger siblings that work in professional jobs in Nigeria, and defendant says that he was very close with his family growing up and remains close, speaking with them weekly. (PSR ¶¶ 86-87.) He then left Nigeria, first for Malaysia and then the United Arab Emirates. (PSR ¶¶ 89-90.) Defendant also claims to have financially supported his children (none of whom lived with him) and parents prior to his arrest. (PSR

---

[13] A custodial sentence will also serve to protect the public from further crimes by defendant while he is in custody.

¶¶ 91-94, 97.)  Defendant grew up with a supportive family and received an education but chose to pursue fraud and money laundering as a source of income.  His crimes were not momentary lapses of judgment, they were his day-to-day business.

Defendant's history and personal characteristics are not mitigating.  Indeed, given his stable family and education, defendant was well situated to be a law-abiding member of society.  Instead, he chose to pursue a global celebrity lifestyle by swindling innocent victims and laundering money for criminals of all stripes.  His greed and ego have driven the many offenses he is known to have engaged in, and he has made a living and cultivated a following by using his ill-gotten gains to create an extravagant lifestyle.

**V.   CONCLUSION**

For the foregoing reasons, the government recommends that the Court should sentence defendant to 135 months' imprisonment, followed by a three-year term of supervised release, and that defendant be ordered to pay restitution of $1,732,841.34, a $500,000 fine, and a mandatory special assessment of $100.